UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FLAY JOHNSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:18-cv-1498-JRS-MPB ) |
| JUSTUS AT WOODLAND TERRACE LLC D/B/A WOODLAND TERRACE OF CARMEL, | ) ) ) ) |
| Defendant. | ) ) |

**Order on Motion for Summary Judgment**

Flay Johnson, an African American, sued Justus at Woodland Terrace LLC d/b/a Woodland Terrace of Carmel ("Woodland Terrace"), alleging that it fired her because of her race in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), and 42 U.S.C. § 1981.[1] Woodland Terrace moves for summary judgment. (ECF No. 54.) Because no reasonable jury could find that Johnson was discharged because of her race, summary judgment should be **granted**.

I.  **Background**

Johnson was hired as a Resident Assistant (Certified Nursing Assistant ("CNA")) for Woodland Terrace in November 2016 and began working there in February 2017.

---

[1] Johnson also alleged that she was fired because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, but her allegations in the Case Management Plan are limited to race discrimination, and her response brief makes no reference to any age discrimination claim. Therefore, the Court understands Johnson to have abandoned any claim under the ADEA. Moreover, in light of the lack of evidence that she was meeting Woodland Trace's legitimate expectations or that its reasons for firing her were pretextual, summary judgment would be appropriate on any age discrimination claim anyway.

(Johnson Dep. 13, 19, ECF No. 55-3.) Her primary responsibility was resident care and her duties included assisting residents; answering all pages for resident assistance in a timely manner; reporting changes in residents' conditions and needs to the licensed nurse and oncoming shift; and documenting and reporting care provided and resident observations. (Johnson Dep., Ex. 6, ECF No. 55-3 at 98.) The Company Associate Handbook identified company policies, including an associate's duty to conduct herself in a professional manner that is in the residents' best interest. (Johnson Dep. Ex. 8 at 10, ECF No. 55-3 at 68.) The handbook identified reasons for disciplinary action, including unsatisfactory job performance, unauthorized leaving of work or work areas prior to the end of a scheduled shift, and "taking more than specified time for lunch or break periods." (*Id.*) In the first few weeks of her employment, Johnson signed and acknowledged receipt of the CNA job description and the company handbook. (Johnson Dep. 20–21, ECF No. 55-3.) Johnson agreed that the safety of the residents should be a primary concern of all Woodland Terrace nurses and CNAs at Woodland Terrace. (Johnson Dep. 18, ECF No. 55-3.) Residents on the Memory Care Unit suffer from dementia or other memory issues, and Johnson agreed that keeping those residents safe required that they be regularly observed. (Johnson Dep. 17, ECF No. 55-3.)

On July 18 to July 19, 2017, Johnson was working the night shift at Woodland Terrace. (Johnson Dep. 44, ECF No. 55-3.) She was assigned to the Assistive Living Unit on the second floor. (Johnson Dep. 40–41, ECF No. 55-3.) Woodland Terrace has security cameras; the cameras show some of Johnson's actions on July 19 from

1:23 a.m. to 4:44 a.m. (Johnson Dep. 38–46, ECF No. 55-3.)[2] At 1:23 a.m., Johnson came onto the Memory Care Unit to answer a call light and assist a resident. (Johnson Dep. 38–39, ECF No. 55-3.) At 1:38 a.m., having assisted the resident, Johnson left the Memory Care Unit. (Johnson Dep. 40, ECF No. 55-3.)

When asked if she recalled seeing any nurses at that time that should have been assigned to the Memory Care Unit, Johnson responded that Ashley Martin was in the Memory Care Unit. (Johnson Dep. 39, ECF No. 55-3.) Johnson did not say that she saw Martin on the unit, however. (*Id.*) Johnson said she knew Martin was in the model room of the Memory Care Unit "because that's where she stated she would be." (*Id.*) At 2:57 a.m., Johnson entered the "In Motion Studio" on the third floor where she performed stretching and yoga, which according to Johnson, was "on [her] lunch." (Johnson Dep. 40–41, ECF No. 55-3.) At 4:23 a.m., Johnson and Cynthia Coleman exited the studio. (Johnson Dep. 41, ECF No. 55-3.) At 4:25 a.m., Johnson and Coleman entered the Life Enrichment Center, which was a break room equipped with a microwave, refrigerator, table, T.V., and sofa. (Johnson Dep. 42–43, ECF No. 55-3.) Johnson remained in the Life Enrichment Center for approximately twenty minutes until 4:44 a.m. (*Id.*) Johnson testified that her lunch break was supposed to be one hour. (Johnson Dep. 41, ECF No. 55-3.) Johnson had not clocked out for the time she was in the In Motion Studio or Life Enrichment Center (Stites Dep. 143–44, ECF No. 55-1), although the Woodland Terrace company policy required her to do so. (Johnson Dep., Ex C, ECF No. 55-3 at 84 ("Accurately recording time worked is the

---

[2] At her deposition, Johnson identified herself in the still photographs taken from the security camera video footage. (Johnson Dep. 38–43, ECF No. 55-3.)

responsibility of the Associate. . . . Time worked is all the time actually spent on the job performing assigned duties. . . . Associates should accurately record the time they begin and end their work, as well as, the beginning and ending time of each meal period.")).

At 4:57 a.m., an orientee (staff in training) responded to a call light to assist a resident on the Memory Care Unit. (Stites Dep. 145, ECF No. 55-1.) All nurses carry pagers that would have been activated by the call light; the other nurses were either not carrying their pagers or not responding to them. (Stites Dep. 146, ECF No. 55-1.) At 5:07 a.m., the orientee again answered a call light on the Memory Care Unit for the same resident needing assistance. (Stites Dep. 146, ECF No. 55-1.) Woodland Terrace's Executive Director Cole Stites testified that it was not appropriate to leave the orientee in charge of the Memory Care Unit without a regular employee there to provide supervision. (Stites Dep. 8, 145, ECF No. 55-1.) Besides, that orientee came from outside the Memory Care Unit to respond to the call light; Martin had not responded to the call light. (*See* Stites Dep. 146, ECF No. 55-1.)

Johnson was scheduled to work the night shift again on July 19 to 20, 2017. When she reported to work, Woodland Terrace's Executive Director Stites and Health Services Director Diane Kohan told her not to clock in, but to go the conference room. (Johnson Dep. 22, ECF No. 55-3; Stites Dep. 151, ECF No. 55-1.) She was later joined by the other nursing staff who had worked the night shift the day before: Coleman, Martin, Hawa Mengoua, and an aid named Brittany. After Stites and Kohan entered the conference room, Sites asked the staff several times to tell him what had

4

happened the night before. (Johnson Dep. 23, ECF No. 55-3.) Martin asked what he was referring to, and Stites said that if they did not say what had happened, all of them would be fired. (Johnson Dep. 23, ECF No. 55-3.) The staff responded by saying that they did not know what Stites was talking about. (*Id.*) No one gave Stites and Kohan any explanation about what had happened the night shift before. (Johnson Dep. 25, ECF No. 55-3.) Stites then announced that all five employees were fired. (Johnson Dep. 23–24, ECF No. 55-3.) Johnson testified that the staff were not given any reason for their terminations, but she did recall being asked who had been on the Memory Care Unit the night before. (Johnson Dep. 23–24, ECF No. 55-3.)

Woodland Terrace explains that it terminated Johnson's employment on July 19, 2017, for abandonment of residents based on her leaving her assigned duties of licensed residential care to go where there were no licensed residential rooms for extended periods of time and leaving the Memory Care Unit unattended. (Stites Dep. 71–72, 74, ECF No. 55-1.) When Stites and Kohan were reviewing the videos of the night shift and deciding what action should be taken, the issue of race was never discussed. (Stites Dep. 152, ECF No. 55-1.) In deciding to discharge the nursing staff, Stites and Kohan considered the nurses' job duties and abandonment of their assigned areas. (Stites Dep. 152–53, ECF No. 55-1.) Neither Stites nor Kohan said anything to Johnson to suggest that the decision to terminate her employment was on the basis of her race. (Johnson Dep. 28, ECF No. 55-3.)

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, a court views the facts and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255.

## III. Discussion

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). In deciding whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge courts consider the evidence "as a whole." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). However, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains a useful tool for presenting and assessing the evidence in discrimination cases. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The parties have employed this framework, and the Court does as well. *See id.*

Under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) her employer took an adverse employment action against her; and (4) a similarly situated employee outside the protected class was treated more favorably. *See*

*Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019); *Johnson*, 892 F.3d at 894–95. If the plaintiff makes this showing, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). The same standard is applied to discrimination claims under § 1981. *Fields*, 928 F.3d at 625.

Johnson cannot show that she was meeting Woodland Terrace's legitimate expectations or that a similarly situated employee outside the protected class was treated more favorably than she. Therefore, Woodland Terrace is entitled to summary judgment on Johnson's race discrimination claims.

It goes without saying, coming to work and actually working as well as following an employer's policies, are basic employment requirements and legitimate expectations of the employer. *See, e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (stating that attendance and adherence to company policies are legitimate expectations); *Evans v. Patrick Alum., Inc.*, 4:16-cv-00160-TWP-DML, 2018 WL 2445544, at *6 (S.D. Ind. May 30, 2018) ("Where an employee is responsible for knowing policy and fails to comply with it, the employee cannot be said to be meeting his or her employer's legitimate expectations."). As a corollary, an employee who abandons her job cannot show that she was meeting her employer's legitimate

7

expectations. *See Stodola v. Finley & Co.*, No. 2:05–CV–464–PRC, 2008 WL 3992237, at *14 (N.D. Ind. Aug. 21, 2008).

Johnson absented herself from the Assistive Living area on the second floor to which she was assigned for an extended period of time during her scheduled shift. The video shows that she was on the third floor in the In Motion Studio for about one and one-half hours and then spent almost half an hour in the Life Enrichment Center. (Stites Dep. 142–44, EC No. 55-1.) Johnson did not perform her job duties during that time; she could have been performing various duties such as manning the nurse's station, filing, and charting, not to mention caring for and assisting residents. (Stites Dep. 143, ECF No. 55-1.) But Johnson failed to perform her job duties and failed to clock out for "lunch" during that time period—a period that in any event exceeded even the one-hour lunch break to which Johnson claimed she was entitled. Per company policy, "taking more than specified time for lunch or break periods" provided a reason for disciplinary action. (Johnson Dep. Ex. C, ECF No. 55-3 at 67–68.) In fact, Johnson absented herself from her assigned work area on the Assistive Living unit and her duties for almost two hours. In abandoning her work area and job duties and conducting herself in a manner that did not serve the residents' interests, Johnson utterly failed to perform her job and failed to follow the company policy against the unauthorized leaving of work areas during a scheduled shift. Also, by failing to clock in and clock out during her non-work time, Johnson violated the company policy which required the accurate reporting of time worked. Thus, Johnson failed to meet Woodland Terrace's legitimate expectations for multiple reasons.

Because Johnson has insufficient evidence even to raise a reasonable inference that she was meeting Woodland Terrace's legitimate expectations, Woodland Terrace should be granted summary judgment. Even if Johnson could raise such an inference, she has insufficient evidence to raise a triable issue as to whether a similarly situated employee outside the protected class was treated more favorably than she.

Johnson points to three employees that she maintains engaged in similar conduct but were not discharged: (1) the concierge, (2) the nurse who gave a resident the wrong medication causing the resident to have a reaction and be sent to the hospital, and (3) the nurse who slept during her shift. Johnson also argues that video from the Memory Care Unit the night after she was fired shows that no one was staffing the nurse's station, yet no one was terminated. "Similarly situated means 'directly comparable' in all material respects." *Johnson*, 892 F.3d at 895 (quoting *Reed v. Freedom Mortg.*, 869 F.3d 542, 549 (7th Cir. 2017)). In the usual case, a plaintiff must show that the comparators: (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2013)).

Johnson argues that the concierge is a permissible comparator because he violated the same general workplace rules by not staying in his designated work area or ensuring that the Memory Care Unit was staffed. But the concierge's job duties and responsibilities were not the same as, nor even relatively similar to, Johnson's duties as a CNA. The concierge's principal responsibility was not resident care, as it was

9

for Johnson. (*See* Kohan Dep. 44, ECF No. 64-1.) Further, contrary to Johnson's position, she was not discharged for violating a "general workplace rule," she was fired for abandoning her assigned work area and job duties for an extended (almost two hour) period of time. The concierge left his work area—the front desk—unattended for a brief time in order to track down a staff member to assist a resident on the Memory Care Unit. This is nothing compared to the seriousness of Johnson's absence from her assigned area for almost two hours, performing activities that furthered her own personal interests rather than that of the residents, the care of whom for which she was responsible.

Johnson next argues that the nurse who gave a resident the wrong medication is a permissible comparator because that nurse caused actual harm. Johnson asserts that she was not accused of harming a resident or engaging in conduct that resulted in any actual harm. There are material differences in the nurse's medication mistake and Johnson's misconduct. Most importantly, there is no suggestion that the nurse intentionally gave the resident the wrong medication, whereas Johnson knowingly and intentionally abandoned her assigned area and duties for approximately two hours. In addition, like the nurse that gave the wrong medication, there is no evidence that the nurse who fell asleep on her shift did so intentionally or that she failed to respond to multiple call lights. Nor is there evidence that she slept for extended time periods. Without such evidence, her conduct is not as serious as Martin's abandonment of her duties. None of these alleged comparators engaged in conduct of

comparable seriousness to Johnson; thus, the different treatment does not raise a reasonable inference of race discrimination.

As for the video of the nurse's station on the Memory Care Unit on the night after Johnson's termination, the video shows that the nurse's station was not staffed at all times (Stites Dep. 175, ECF No. 55-1), but it does not show that the staff on duty left the Memory Care Unit unattended to engage in personal activities as Johnson did. Johnson acknowledges that the nursing staff was supposed to make rounds and check on residents. The video footage from the night shift following Johnson's termination does not raise an inference of sufficiently comparable misconduct by the nursing staff. Johnson has insufficient evidence that Woodland Terrace treated similarly situated employees outside the protected class more favorably. Therefore, Woodland Terrace should be granted summary judgment.

Even if Johnson could present evidence to raise a dispute as to whether any of the alleged comparators was similarly situated to her, without question, she has insufficient evidence to raise a reasonable inference that she was meeting Woodland Terrace's legitimate expectations. For all these reasons, Woodland Terrace is entitled to summary judgment on Johnson's race discrimination claims.

**Conclusion**

For the reasons stated, Defendant's motion for summary judgment (ECF No. 54) is **granted**.

**SO ORDERED.**

Date: 12/31/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Tiffany Ruth Guthrie
STEWART & STEWART
Tiffany@getstewart.com

Robert M. Kelso
KIGHTLINGER & GRAY, LLP (Indianapolis)
rkelso@k-glaw.com

Darron S. Stewart
STEWART & STEWART
darron@getstewart.com

Megan Ann Van Pelt
KIGHTLINGER & GRAY LLP
mvanpelt@k-glaw.com